## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JAMES K. WALKER,

       *Plaintiff,*

vs.

      Case No. 17-03176-EFM-ADM

JEFF EASTER and HAROLD STOPP, D.O.,

       *Defendants.*

## MEMORANDUM AND ORDER

Proceeding pro se, Plaintiff James K. Walker filed this suit alleging that he received inadequate medical care while incarcerated at Sedgwick County Adult Detention Facility ("SCADF") between June 1, 2017, and February 28, 2018. Defendants Sheriff Jeff Easter and Harold Stopp, D.O., are the only remaining Defendants in this case. Against Dr. Stopp, Walker asserts claims of medical negligence and deliberate indifference to serious medical need under the Eighth and Fourteenth Amendments. Against Sheriff Easter, Walker seeks an order from the Court ordering Sheriff Easter to pay compensatory and punitive damages. Pending before the Court is Defendants' Motion for Summary Judgement (Doc. 109) and Walker's Motion for Summary Judgment (Doc. 111). For the reasons set forth below, the Court grants Defendants' motion and denies Walker's motion.

# I.     Factual and Procedural Background

## A.     Local Rules for Summary Judgment

The required rules for summary judgment motions in the District of Kansas are set forth in D. Kan. Rule 56.1. Subsection (b) addresses memorandums opposing summary judgment. A memorandum in opposition must first state the material facts as to which the opposing party contends there is a genuine dispute.[1] Each fact in dispute must be numbered by paragraph, refer to the number of the movant's fact in dispute, and refer to the record with particularity.[2] Additionally, the party opposing summary judgment must set forth any additional facts it relies on supported by references to the record.[3]

In this case, Walker filed several documents in response to Defendants' Motion for Summary Judgment. He filed a "Motion Plaintiffs' Opposition to Defendants' Summary Judgment Motion," which is handwritten and one page. Attached as exhibits to this document are (1) "Plaintiffs' Brief in Support of Opposition of Defendants' Summary Judgment Motion;" (2) Plaintiff's Affidavit in Support of Opposition to Defendants' Motion for Summary Judgment;" and (3) "Plaintiffs' Statement of Disputed Factual Issues in Support of Opposition to Defendants' Summary Judgment Motion."

Defendants argue that Walker has not responded to Defendants' Statement of Uncontroverted Facts. But, Walker's Affidavit makes specific reference to the page and paragraph number of the statements set forth in Dr. Stopp's Affidavit. Defendants have extensively cited Dr.

---

[1] D. Kan. Rule 56.1(b)(1).

[2] *Id.*

[3] D. Kan. Rule 56.1(b)(2).

Stopp's Affidavit in their Statement of Uncontroverted Facts. Therefore, the Court will look to Walker's Affidavit in determining which facts remain uncontroverted.

Defendants also point out that none of the documents Walker filed in response to Defendants' motion includes a section titled "statement of additional material facts." However, Walker's Brief in Support of Opposition contains 35 numbered paragraphs that contain a mixture of alleged facts, conclusory statements, and legal arguments. Some of these facts are supported by Walker's affidavit. Defendants have responded to the numbered statements in Walker's Opposition Brief as though it were an additional statement of facts. Therefore, to the extent these facts are supported by Walker's affidavit, the Court will consider them in this Order.

**B.      Facts**

*1.      Walker's Medical Treatment While at SCADF*

Plaintiff was incarcerated at SCADF from August 15, 2015, to February 28, 2018. Sometime before June 1, 2017, Plaintiff contracted a skin condition and a suspected DVT[4] in his leg. For the skin rash he took Triamcinolone 0.1% cream, and Thera-Derm lotion, and for the DVT, he took a blood thinner called warfarin (sold under the brand name Coumadin). Periodically, he would have labs taken to test his INR[5] and Prothrombin Time (PT). Because he was taking Coumadin, the lab reports would often show his INR level as "high" compared to the reference range. The goal, however, was to keep him in the "therapeutic" range.

---

[4] The Court assumes "DVT" stands for deep vein thrombosis.

[5] Defendants have not informed the Court what "INR" means. According to the health encyclopedia from the University of Rochester Medical Center, "INR" is the abbreviation for "international normalized ratio." It is a blood test that looks to see how well blood clots. *See* https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=167&contentid=international_normalized _ratio (last visited Jan. 30, 2020).

In June 2017, the outside pharmacy sent DermaDaily instead of Thera-Derm for Walker to use. Dr. Stopp, one of Plaintiff's attending physicians at SCADF, did not order DermaDaily and did not know why the pharmacy sent that lotion instead of Thera-Derm. On June 17, 2017, Walker signed a document stating that he understood the instructions for DermaDaily, which included applying it in the morning as needed. This form is part of the KOP ("Keep on Person") program, which if signed authorizes an inmate to keep the medications identified and provided to them on their person.

On July 25, 2017, Walker reported to sick call that he was having an allergic reaction to the lotion he was using. This is Walker's first documented complaint regarding DermaDaily. He had a large red rash on his abdomen and right leg. Walker reported that he was not getting the right lotion. One of the sick call nurses called the pharmacy tech, who stated that Thera-Derm and DermaDaily are the same medication. The nurse noted that she would call the patient back the next day to discuss other cream options. Dr. Stopp, however, noted that the patient "needs a different cream for rash on trunk and extremities. This is allergic to current cream. Will order Theraderm [sic]." Dr. Stopp also ordered Tramadol for Walker's pain.

On July 26, Dr. Stopp ordered an antihistamine to treat Walker's rash. Additionally, Walker's INR and PT levels were checked and were in therapeutic range. His next INR was scheduled for August.

On July 28, the nurse followed up with the pharmacy, noting that the Thera-Derm had not arrived. She refaxed an order from July 20 and wrote "Please DO NOT send Derma daily [sic]. Please send Thera-Derm." She also called the pharmacy tech, who said that the cream would arrive the next day.

On July 31, Dr. Stopp noted that Thera-Derm was ordered, and that Walker signed the KOP document showing he reviewed the instructions for Thera-Derm. Dr. Stopp understood this to mean that Walker received the Thera-Derm on or about this date. Walker, however, denies that he received it.

Walker reported to sick call on August 1, complaining of a painful rash on his arms, face, and left side of the abdomen. Dr. Stopp examined Walker and entered a new order for a steroid named Prednisone. Three days later, Walker presented to Dr. Stopp with the rash on his lower extremities, abdomen, and arms. Dr. Stopp concluded that Walker had dermatitis and told him to continue the Prednisone and Thera-Derm. He also ordered Walker to use Vaseline. The next day, on August 5, Dr. Stopp ordered a bilateral ultrasound to the lower extremities to rule out DVT.

From August 12 to August 29, Plaintiff was examined by a physician assistant ("PA"). She continued to treat the rash with Prednisone, and her notes state that under this treatment, the rash markedly improved. As of August 19, Walker still had not received the Thera-Derm. The PA discussed this issue with the medical assistant, who contacted the pharmacy to help resolve the issue. On August 21, Walker signed the KOP form indicating he received instructions for the Thera-Derm, and on August 25 for the petroleum jelly.

On August 28, lab results showed Plaintiff's INR to be six, which is a "critical" level, rather than a "therapeutic" level. The PA noted that the combination of the Prednisone and Coumadin may be the reason, so she decided to hold the Coumadin until the INR was less than three. She also considered stopping Prednisone before restarting Coumadin.

On August 29, Walker's INR was still at six. Dr. Stopp ordered the Coumadin to be discontinued. On August 30, Walker's INR was down to 3.5. The plan was to continue to hold the Coumadin while the patient was on Prednisone. On August 31, Walker's INR was down to

1.7, which is within the "therapeutic" range. On September 1, Walker started back on Coumadin but at a lower dose than previously given. His next PT/INR was to be drawn on September 7.

On September 7, Walker reported to sick call complaining that his rash had worsened. Walker alleges that Thera-Derm was not helping with the rash at this time. Dr. Stopp examined Walker while he was in clinic on September 7. In addition to the rash, Walker complained of swelling and pain in both legs. Dr. Stopp noted that Plaintiff had bilateral swelling in the lower left extremities and erythema more in the right than the left. Labs were drawn to check his INR, which came back at 1.0. Dr. Stopp ordered an ultrasound of both legs to rule out a DVT. Plaintiff was also given hydroxyzine, which can be used to treat allergies, skin rash, hives and itching.

Kansas Mobile Solutions performed an ultrasound on Plaintiff on September 8, which showed a DVT (clot) in the left leg. Dr. Stopp reviewed the result.

On September 12, Walker signed the KOP indicating that he read the instructions for Thera-Derm. The next day, he was seen by a PA. Walker complained of worsening cellulitis of the lower left extremity and on his arms. At this point, his extremities were starting to show signs of "weeping." The plan was to elevate the lower extremities, do labs, and be seen by Dr. Stopp in the morning.

Beginning September 14, Walker was moved to the infirmary. Infirmary staff attempted to start him on IV antibiotics but were unable due to the inability to get an IV site. It was noted that multiple courses of oral antibiotics had failed. He continued to have a rash on both legs. The lower right leg had marked increase in edema, there was scant fluid at left ankle, which was described as honey crusted. Because of the changes in his condition, Dr. Stopp ordered Walker to be sent to the hospital for further evaluation. Dr. Stopp also noted the inability to get an IV site as a reason for sending him to the hospital.

Plaintiff was at the hospital from September 16 to September 20. He reported to the emergency department that he had developed a rash on his face and upper body a year ago, he was seen by a dermatologist, and was put on Thera-Derm with improvement of his symptoms. He reported his belief that the jail had switched him to DermaDaily. While using the new medication, he developed bilateral swelling and redness on June 20, 2017. He reported that since then he has been on steroids and multiple antibiotics. Steroids helped the swelling, but the symptoms never resolved.

Walker saw an infectious disease specialist and a hospitalist/internal medicine specialist while in the hospital. They had consulted infectious disease and started Ancef on September 18 to cover any secondary infection. He had a punch biopsy which revealed mild spongiosis and superficial perivascular dermatitis. His discharge diagnosis was "less likely to be infectious, no major drug offenders; rheumatologic?" He was also told to continue the Triamcinolone cream and to follow up with dermatology as an outpatient.

Upon his return to SCADF, Walker was placed in the infirmary. On September 21, Walker reported to the nurse his belief that his rash was going to come back as soon as he stopped taking Prednisone. The nurse gave him information about orders to keep ambulation at a minimum and to use a foam wedge to elevate his legs while in bed. Walker indicated that he understood and was willing to comply. Dr. Stopp saw Walker in the infirmary that day and referred him to a dermatologist. Pain medications were given, and the outpatient appointment with the dermatologist was scheduled for October 3. Notes concerning Walker's stay in the infirmary continue reflecting assessments and changes in his care plan, including issues relating to his rash and monitoring his PT/INR and making corresponding Coumadin adjustments. At times, notes

showed Walker's lack of compliance with using the wedge and keeping his legs elevated, declining to have a dressing applied, and desire to apply his own medicinal creams.

On October 3, Walker went to the outside appointment with dermatology for evaluation of his body rash. He returned with orders to start Clobetasol cream, continue use of the Triamcinolone cream, to stay off Prednisone, and to be seen for a follow-up appointment in 30 days.

Walker reported that his legs were looking better but he was still having discomfort from the rash. The plan was to discharge him from the infirmary to POD.[6] Orders were entered to continue the current plan of care and initiate the dermatology recommendations.

On October 4, Dr. Stopp entered an order for the ointments recommended by the dermatologist. The next day, the nurse confirmed with the PA that Walker could use Vaseline and Thera-Derm. Dr. Stopp also encouraged Walker to use these medications per the dermatologist's recommendations and told him they were waiting on the Clobetasol to be approved. The rash was better, and there was decreased erythema and swelling. Walker was discharged from the infirmary on October 5.

Walker continued to have follow-up appointments with the dermatologist in November, December, and January. His medication was adjusted at each appointment. Dr. Stopp and other SCADF medical staff entered orders to make all the changes recommended by the dermatologist. On February 28, 2018, Walker was transferred to the custody of the Department of Corrections. He is currently incarcerated at Norton Correctional Facility.

---

[6] The parties have not defined the term "POD."

*Walker's Allegations in This Lawsuit*

Plaintiff filed this lawsuit while still incarcerated at SCADF.  His most current allegations are set forth in the Third Amended Complaint.  Plaintiff generally asserts that the "SCADF Clinic doctors" failed to respond appropriately to all of his serious medical needs, that the doctors failed to research his disability before prescribing medication and medical treatment, and that the doctors failed to research his allergic reactions, sensitive skin, blood levels, and DVT.  More specifically, he alleges that on June 20, 2017, he was given DermaDaily, instead of Thera-Derm, and that he had an allergic reaction to it.  He also alleges that in September 2017, Dr. Stopp gave him steroids which "conflicted with" his blood-thinning prescription medicines.  He alleges that his rash did not improve as a result of the steroids and that he was rushed to the hospital on September 16, 2017.  Walker alleges that his skin condition did not improve after he was released from the hospital. On October 3, 2017, Walker was taken to a skin specialist.  He was given a new prescription but alleges there was some delay in receiving it.

Walker's remaining claims against Dr. Stopp include a claim for violation of his Eighth and Fourteenth Amendment rights under 42 U.S.C. § 1983 and a claim for medical negligence under Kansas law.  Walker also seeks "injunctive relief" against Sheriff Easter, asking the Court to order Sherriff Easter to pay compensatory and punitive damages.

During discovery, Plaintiff did not make an expert witness disclosure.  At the status conference on July 25, 2019, Walker asked Magistrate Judge Mitchell to appoint him an expert based on his indigent status.  Magistrate Judge Mitchell denied Walker's request, citing Federal Rule of Evidence 706 and several cases from the Tenth Circuit supporting her decision.  She then asked Walker if he intended to retain an expert in this case.  He responded, "Mr. Walker is an indigent inmate.  He cannot afford an expert witness."  Magistrate Judge Mitchell construed this

response as "confirmation that the plaintiff is not intending to use an expert given the Court's unwillingness to appoint and pay for an expert." Walker objected to Magistrate Judge Mitchell's decision, but the Court denied his request to overrule her Order.

Defendants filed their Joint Motion for Summary Judgment on September 12, 2019, seeking judgment on the remaining claims in the case. Plaintiff filed his own Motion for Summary Judgment the next day.[7] Walker's motion is somewhat difficult to comprehend because his argument is scattered throughout the seven documents he filed. Based on the Court's reading of these documents, Walker's motion seeks summary judgment on his § 1983 claim, medical negligence claim, and the injunctive relief he seeks against Sheriff Easter.[8] He also asks the Court to re-instate previously dismissed defendants and grant him additional declaratory relief including but not limited to compensatory damages, punitive damages, and the re-naming of SCADF.[9]

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[10] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered

---

[7] Defendants served their motion by mail. Walker filed his motion the day after Defendants' filed theirs on CM/ECF. Because it would be impossible for Walker to respond to Defendants' motion in the 24-hour period after it was filed, the Court treats Walker's motion as a cross-motion for summary judgment and not as a response to Defendants' motion.

[8] Walker also references claims for excessive force and violation of the American with Disabilities Act, but these claims have already been dismissed by the Court. Therefore, the Court need not address these arguments in its Order.

[9] Walker also asks the Court to grant him a jury trial, which it has already done in the Order (Doc. 123) filed on October 8, 2019.

[10] Fed. R. Civ. P. 56(a).

evidence permits a reasonable jury to decide the issue in either party's favor.[11] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[12] If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must instead set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[13] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[14] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[15]

The Court applies the same standard to cross-motions for summary judgment. Each party bears the burden of establishing that no genuine issue of material fact exists and that it is entitled, as a matter of law, to the judgment sought in its motion.[16] Cross motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another."[17] But where the cross motions overlap, the Court may address the legal arguments together.[18]

---

[11] *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citations omitted).

[12] *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citations omitted).

[13] *Id.* (citing Fed. R. Civ. P. 56(e)).

[14] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[15] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[16] *Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[17] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[18] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).

Finally, Walker is proceeding pro se, and the Court must afford him some leniency in his filings.[19]  A pro se litigant, however, is still expected to "follow the same rules of procedure that govern other litigants."[20]

### III.    Analysis

Because the parties' cross motions for summary judgment overlap, the Court will address their legal arguments together.  Both parties contend that they are entitled to judgment as a matter of law on Walker's claims of deliberate indifference under the Eighth and Fourteenth Amendments, medical negligence, and declaratory relief in the form of compensatory and punitive damages.  The Court will address each of these claims below.

### A.    Walker's Deliberate Indifference Claim

Walker asserts a claim for violation of his Eighth and Fourteenth Amendment rights under 42 U.S.C. § 1983.  The Eighth Amendment prohibits "cruel and unusual punishments."[21]  "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."[22]  The Fourteenth Amendment is implicated by Walker's potential status as a pretrial detainee during the time in question.[23]  "Under the Fourteenth Amendment's due process clause, pretrial detainees . . . are entitled to the same degree of

---

[19] *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007).

[20] *Id.*

[21] U.S. Const. amend. VIII.

[22] *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

[23] It's not clear whether Walker was a pretrial detainee or serving a sentence during the time at issue in this case.  Regardless, whether Walker was serving a sentence or was a pretrial detainee, the same standard is applied to his claim of an unconstitutional denial of medical care. *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1188 (10th Cir. 2003).

protection regarding medical attention that afforded convicted inmates under the Eighth Amendment."[24]

In *Estelle v. Gamble*,[25] the U.S. Supreme Court held that "prison officials violate the Eighth Amendment's ban on cruel and unusual punishment if their 'deliberate indifferent to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain.' "[26] The U.S. Supreme Court has adopted a two-prong inquiry for analyzing such claims, requiring the plaintiff to prove both an objective and subjective component.[27] To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension."[28] "A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[29] Defendants do not address the objective component in their motion. Therefore, the Court will focus its analysis on whether Walker has come forward with sufficient evidence to show a genuine issue of material fact regarding the subjective component.

---

[24] *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992).

[25] 429 U.S. 97 (1976).

[26] *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Estelle*, 429 U.S. at 104). The Eighth Amendment's ban on cruel and unusual punishment is made applicable to the States through the Fourteenth Amendment. *See Estelle*, 429 U.S. at 102.

[27] *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

[28] *Self*, 439 F.3d at 1230 (quoting *Farmer*, 511 U.S. at 834).

[29] *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (quotation marks and quotation omitted).

"[U]nder the subjective inquiry, the prison official must have a 'sufficiently culpable state of mind.' "[30]  An "inadvertent failure to provide adequate medical care" does not give rise to a claim under 42 U.S.C. § 1983; nor do allegations regarding mere negligence or malpractice give rise to such a claim.[31]  "Rather, 'a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.' "[32]  The U.S. Supreme Court has "made clear" that "a prison official cannot be liable 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' "[33]

"[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation."[34]  Simply put, "no claim of constitutional dimension is stated where a prisoner challenges only matters of medical judgment or otherwise expresses a mere difference of opinion concerning the appropriate course of treatment.[35]  Furthermore, "a delay in providing medical care does not violate the Eighth Amendment unless there has been deliberate indifference resulting in substantial harm."[36]

---

[30] *Self*, 439 F.3d at 1230-31 (quoting *Farmer*, 511 U.S. at 834).

[31] *Id*. at 1230.

[32] *Id*. (quoting *Estelle*, 429 U.S. at 106).

[33] *Id*. at 1231 (quoting *Farmer*, 511 U.S. at 837).

[34] *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)).

[35] *Smith v. Harvey Cty. Jail*, 889 F. Supp. 426, 430 (D. Kan. 1995) (citing *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992)).

[36] *Id*. (citing *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993)).

Here, Walker has not come forward with any evidence showing that Dr. Stopp acted with deliberate indifference to his medical needs. With regard to Walker's complaints about DermaDaily, the undisputed facts show that Dr. Stopp did not order DermaDaily in place of Thera-Derm and was not aware that the pharmacy switched the medications in mid-June. Furthermore, Walker's first complaint regarding the DermDaily was not until July 25, when he reported to sick call that he was having an allergic reaction to the lotion he was using. In response to Walker's complaints, the nurse called the pharmacy tech, who said that DermaDaily was the same as Thera-Derm. But, Dr. Stopp noted that Walker "needs a different cream for rash on trunk and extremities. Thinks is allergic to current cream. Will order Theraderm." The nurse then followed up on July 28, refaxing a previous order, and specifically requested Thera-Derm. Nothing about this situation implicates Dr. Stopp as being responsible for switching the lotions or being too slow to react to Walker's complaint, much less being deliberately indifferent to Walker's medical needs.

In his opposition brief and affidavit, Walker states that he still had not received the Thera-Derm as of August 19.[37] But, even in light this evidence, there is no issue of material fact as to the claim against Dr. Stopp. Walker has not introduced any evidence that Dr. Stopp was aware that Walker was having continued problems obtaining Thera-Derm after July 25. Walker's complaint that he was having problems with the pharmacy on August 19 was made to the PA, not Dr. Stopp. Furthermore, the PA responded to the issue by discussing it with the CMA who contacted the pharmacy to resolve the issue.

---

[37] Walker's affidavit is inconsistent regarding when he actually received Thera-Derm. He states that on August 4, he still has a rash and that "Thera Derm, Hydroxyzine, Prednisone," and "Vaseline" provided no relief. He then states that as of August 19, the pharmacy had not sent the right medication.

Walker also alleges that Dr. Stopp caused his blood to become too thin by prescribing the steroid Prednisone.  The undisputed facts show that Dr. Stopp initially ordered Prednisone on August 1 when Walker reported to sick call complaining of a painful rash.  Dr. Stopp saw Walker again on August 4.  His rash was not improving and was spreading to other areas of his body.  Dr. Stopp's plan was to continue the Prednisone.  Walker followed up with the PA—not Dr. Stopp— until August 29, when his INR was at a critical level.  At that time, Dr. Stopp ordered the Coumadin to be withheld.  Walker's INR results were back to a therapeutic level by August 31, and on September 1, Dr. Stopp ordered Walker to take a lower dose of Coumadin than what was previously given.  When Walker presented to the clinic on September 7 complaining of pain and swelling in his legs, Dr. Stopp ordered an ultrasound and hydroxyzine to treat the rash.  Walker was then treated by the PA on September 13, 14, and 16, who moved him to the infirmary because of edema in both legs and weeping fluid from the right leg.  On September 16, Dr. Stopp ordered Walker to be placed in St. Francis hospital because of his worsening condition and because of the clinic's inability to get an intravenous ("IV") site for antibiotics.  Walker remained at the hospital until September 20.  His discharge diagnosis was "less likely to be infectious, no major drug offenders; rheumatologic?"  The discharge plan included 60mg of Prednisone daily with Triamcinolone cream and following up with dermatology.  Upon discharge Walker was placed in SCADF's infirmary.  Notes from his stay reflect assessments and changes in the plan, including issues related to his rash, monitoring his INR, and making corresponding Coumadin adjustments.

Nothing about these facts show that Dr. Stopp acted with a culpable state of mind and was deliberately indifferent to Walker's medical needs.  Rather, Dr. Stopp modified Walker's Coumadin levels in response to critical INR levels, ordered ultrasounds to rule out DVT, and transferred Walker to the hospital upon his worsening condition and the medical staff's inability

to administer IV antibiotics. Even the hospital's discharge diagnosis does not indicate that the inappropriate use of Prednisone caused Walker's medical condition. In fact, Walker's discharge order included a prescription for him to keep using it. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Walker's § 1983 claim against Dr. Stopp. The Court also denies Walker's motion for summary judgment as to this claim. The summary judgment facts, when viewed in Dr. Stopp's favor, do not establish that Dr. Stopp violated the Eighth Amendment as a matter of law.

## B.    Walker's Medical Negligence Claim

To prevail on his medical negligence claim, Walker must prove: (1) Dr. Stopp owed him a certain standard of care; (2) Dr. Stopp breached this standard of care; (3) Walker was injured; and (4) Walker's injury proximately resulted from the breach in standard of care.[38] Dr. Stopp seeks summary judgment on this claim on the basis that Walker has not designated an expert to testify regarding standard of care and causation.

Kansas law governs the question of whether expert testimony is required in a medical negligence case.[39] Generally, expert testimony is required on the issues of standard of care, deviation from the standard of care, and causation in a medical malpractice claim.[40] However, there is an exception to this rule when "the lack of reasonable care or the existence of proximate

---

[38] *Watkins v. McAllister*, 30 Kan. App. 2d 1255, 59 P.3d 1021, 1023 (2002) (citing *Schmidt v. Shearer,* 26 Kan. App. 2d 760, 995 P.2d 381, 386 (1999)).

[39] *Treaster v. Healthsouth Corp.*, 442 F.Supp. 1171, 1180–81 (D. Kan. 2006).

[40] *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 756 P.2d 416,420 (1988) (citing *Webb v. Lungstrum*, 223 Kan. 487, 575 P.2d 22, 25 (1978)).

cause is apparent to the average layman from common knowledge or experience."[41]   Referred to

as the "common knowledge exception," it has been explained as follows:

> There is a common knowledge exception to the rule requiring expert medical testimony in malpractice cases.  This common knowledge exception applies if what is alleged to have occurred in the diagnosis, treatment, and care of a patient is so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally.[42]

The issue of whether the common law exception applies is a question of law.[43]   Kansas

courts have applied the exception sparingly.[44]   Among the cases where courts have applied the

exception, and found expert testimony is not required, are instances where a nursing home patient

attacked another where the nursing home was aware of the patient's propensity of attacking other

patients; where a nurse failed to notify the physician that delivery of the patient's child was

imminent, resulting in an unattended childbirth with consequent injuries; and where a hospital's

nurses made only one attempt to contact a patient's doctor in response to his severe pain.[45]   Among

the cases where the common knowledge exception has not been applied, and a case lacking expert

testimony was found fatally flawed, are instances where a nursing facility assistant negligently

fractured the leg of a patient suffering from osteoporosis; where a hospital was sued when a doctor

left clips in a patient after surgery who then developed staph infection; and where a surgeon failed

---

[41] *Id.* (citations omitted).

[42] *Hare v. Wendler*, 263 Kan. 434, 949 P.2d 1141, 1147 (1997) (quoting *Webb* 575 P.2d at 25).

[43] *Perkins v. Susan B. Allen Mem. Hosp.*, 36 Kan. App. 2d 885, 146 P.3d 1105, 1108 (2006) (citation omitted).

[44] *Cooper v. Cicarelli*, 2009 WL 539911, at *4 (D. Kan. 2009) (citations omitted).

[45] *See Schara v. Pleasant Valley Nursing, LLC*, 2009 WL 2195107, at *3 (D. Kan. 2009) (collecting cases).

to X-ray a wound to discover an imbedded metal fragment but completed surgery leaving the fragment inside.[46]

Walker concedes in his opposition brief that he needs an expert witness in this case. Consistent with that admission, the Court concludes that the common knowledge exception does not apply to Walker's claim. As to Walker's allegations that he suffered an allergic reaction to DermaDaily, Walker must obtain an expert on at least the causation element of his claim. Walker must address several issues in regard to causation: (1) he suffered from a pre-existing skin condition that can also cause a rash; (2) even after the lotion was switched back to Thera-Derm, Walker continued to suffer the rash; and (3) his medical providers, including those at the hospital, thought that the rash may have been caused by a skin infection and treated him with antibiotics. As to Dr. Stopp, Walker must address the fact that Dr. Stopp did not order the DermaDaily and that Dr. Stopp immediately ordered the Thera-Derm after Walker presented in the clinic complaining of the DermaDaily on July 25, 2017. Given these facts, the causation issue in this case is complex. A layperson cannot determine whether Dr. Stopp's actions caused or contributed to an increase in Walker's symptoms. Proof linking any negligent act by Dr. Stopp to Walker's injury requires expert testimony.

As to Walker's allegations that Dr. Stopp was negligent in prescribing Prednisone, expert testimony is required on at least the standard of care element of Walker's claim. Dr. Stopp first prescribed the Prednisone on August 1. Dr. Stopp examined Walker again on August 4 and concluded that he had dermatitis. The plan was to continue the Prednisone and Thera-Derm. On August 5, a verbal order was given to do a bilateral ultrasound to rule out DVT. Dr. Stopp was

---

[46] *Id*. (collecting cases).

not involved in Walker's medical care again until August 29, when Walker's INR level was 6.0. Dr. Stopp ordered the Coumadin to be withheld until the INR reached a therapeutic level. Walker alleges in his Third Amended Complaint that he was sent to the hospital because of the Prednisone, but the medical records show otherwise. The records show that Walker was sent to the hospital on September 16 because of his worsening condition, which included painful swelling and weeping in his lower legs. He was also transferred to the hospital for the purpose of starting IV antibiotics. Upon discharge from the hospital, Walker was ordered to take Prednisone.

Lay people do not prescribe Prednisone and are not aware of what level of adjustment is necessary in a person who is taking Coumadin. The undisputed facts in this case do not show that Dr. Stopp's orders regarding the Prednisone were so unreasonable that a jury could conclude that he deviated from the standard of care. Therefore, the common knowledge exception does not apply to Walker's negligence claim regarding the Prednisone prescription.

In sum, expert testimony is required for Walker's medical negligence claim against Dr. Stopp. Walker has not designated an expert and stated at the status conference that he does not intend to do so. Accordingly, the Court grants Defendants' motion for summary judgment on this claim. Additionally, the Court denies Walker's motion for summary judgment on his negligence claim. When viewed in Defendants' favor, the facts fail to establish that Dr. Stopp was negligent as a matter of law.

**C.      Walker's Claims for Injunctive Relief Against Sheriff Easter**

Walker seeks what he calls an "injunction" against Sheriff Easter, but he is asking the Court to order Sheriff Easter to pay damages. Specifically, Walker seeks a "permanent injunction ordering Defendants Dr. Harold Stop[p] . . . [and] Jeff Easter . . . to pay individual capacity, and

official capacity also compensatory damages in the [a]mount of $350,000 against each defendant, jointly and severally.  Punitive damages in the amount of $150,000 against each defendant."

An injunction is a court order requiring a person to do or cease doing a specific action.  To obtain a permanent injunction, a plaintiff must establish "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm the injunction may cause the opposing party; (4) the injunction . . . will not adversely affect the public interest."[47]

Walker cannot obtain injunctive relief.  The Court has already dismissed Walker's claims for monetary damages against Sheriff Easter, which renders an injunction ordering such damages to be nonsensical.  Furthermore, one of the requirements for obtaining injunctive relief is that the party will suffer irreparable harm.  "Irreparable harm may be found where evidence suggests that it will be 'impossible to precisely calculate the amount of damages plaintiff will suffer.' "[48] Walker's request for an injunction ordering damages thus disproves itself.  The Court also notes that Walker has not been in SCADF custody since February 28, 2018.  Since that date, Sheriff Easter could take no action that would impact Walker, rendering Walker's request for injunctive relief moot.  For these reasons, the Court grants summary judgment for Defendants on Walker's request for injunctive relief against Sheriff Easter.  It also denies Walker's motion for summary judgment as to Sheriff Easter because he has not set forth any facts showing that he is entitled to such relief.

---

[47] *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th 2009) (citing *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007)).

[48] *Id.*

## IV.     Conclusion

For the reasons explained above, the Court grants Defendants' Motion for Summary Judgment and denies Walker's motion for summary judgment.  To the extent Walker seeks any further relief in his summary judgment motion that the Court has not specifically addressed in this Order, it is denied. Walker has not laid out uncontroverted, admissible facts and a legal basis to support the relief he requests.

**IT IS THEREFORE ORDERED** that Defendants' Joint Motion for Summary Judgment (Doc. 109) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 111) is **DENIED**.

**IT IS SO ORDERED**.  This case is now closed.

Dated this 12th day of February, 2020.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE